DORITY & MANNING, P.A.
Nicole S. Cunningham (CA 234390)
Steven A. Moore (CA 232114)
2869 Historic Decatur Road
San Diego, California 92106
Telephone: (864) 271-1592
ncunningham@dority-manning.com
smoore@dority-manning.com

DORITY & MANNING, P.A.
Tim F. Williams (*pro hac vice pending*)
Mark H. Johnson (*pro hac vice pending*)
75 Beattie Place, Suite 1100
Greenville, South Carolina 29601
Telephone: (864) 271-1592
timw@dority-manning.com
mjohnson@dority-manning.com

*Attorneys for Plaintiff*
*Mattson Technology, Inc.*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTSON TECHNOLOGY, INC., a Delaware Corporation<br><br>Plaintiff,<br><br>v.<br><br>APPLIED MATERIALS, INC., a Delaware Corporation, VLADIMIR NAGORNY, an individual, and RENE GEORGE, an individual,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>(1) TRADE SECRET MISAPPROPRIATION UNDER 18 U.S.C. § 1836, ET SEQ.<br><br>(2) BREACH OF CONTRACT<br><br>(3) INDUCING BREACH OF WRITTEN CONTRACTS<br><br>(4) UNFAIR COMPETITION UNDER CAL BUSINESS AND PROFESSIONS CODE § 17200, ET SEQ.<br><br>(5) TRADE SECRET MISAPPROPRIATION UNDER CAL. CIV. CODE § 3426, ET SEQ.<br><br>(6) CONVERSION<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Mattson Technology, Inc. ("Plaintiff" or "Mattson"), by and through its undersigned attorneys, for its complaint against Applied Materials, Inc. ("Applied") and current Applied employees Vladimir Nagorny and Rene George (together, the "Individual Defendants") (collectively, "Defendants"), alleges as follows:

## NATURE OF LAWSUIT

1.      This action involves claims for trade secret misappropriation arising under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, et seq., breach of contract, inducing breach of written contracts, unfair competition arising under Cal. Bus. & Prof. Code § 17200, et seq, trade secret misappropriation arising under Cal. Civ. Code § 3426, et seq., and conversion.

2.      Mattson brings this action to prevent Applied and its employees from exploiting Mattson's most valuable trade secrets and to unlawfully and unfairly compete with Mattson.

## THE PARTIES

3.      Plaintiff Mattson Technology, Inc. is, and at all relevant times has been a corporation organized under the laws of the state of Delaware with its global headquarters in Fremont, California.

4.      Upon information and belief, Defendant Applied Materials, Inc. is, and at all relevant times was, a Delaware corporation with its principal place of business in Santa Clara, California operating its business interstate and internationally. Applied currently employs each of the Individual Defendants, as well as numerous other former employees of Mattson, many of whom were formerly employed by Mattson in this District. Upon information and belief, at least some of these former employees perform their work for Applied within this District. Applied's business derives substantial revenue from its operations within this District.

5.      Upon information and belief, Defendant Vladimir Nagorny resides in Tracy, California. He is a "Physicist/Scientist Director" at Applied. He was employed as a "Fellow" in the Plasma Technology Group at Mattson and working at Mattson's facilities in Fremont, California until June 16, 2017, in coordination with other Mattson employees in Mattson's facilities in Fremont, California, including when certain facts underlying this Complaint occurred. Dr. Vladimir Nagorny signed the Proprietary Information and Innovations Assignment

COMPLAINT AND DEMAND FOR JURY TRIAL

Agreement ("PIIA"), once on July 13, 2006 and again on April 1, 2010, agreeing to jurisdiction in California.

6.      Upon information and belief, Defendant Rene George resides in Redwood City, California. He is currently a "General Manager" at Applied. He was a Vice President and the "General Manager" of the Plasma Etch and Strip Division at Mattson and working at Mattson's facilities in Fremont, California until January 9, 2015, in coordination with other Mattson employees in Mattson's facilities in Fremont, California, including when certain facts underlying this Complaint occurred. Like Dr. Vladimir Nagorny, on January 9, 2015, Rene George signed the Termination Certificate included as Ex. B of the Proprietary Information and Innovations Assignment Agreement ("PIIA") that includes an agreement that disputes will be subject to jurisdiction in California. Mr. Rene George also signed a Confidentiality Agreement on January 15, 1996, explicitly governed by the laws of the State of California.

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

7.      This Court has original jurisdiction of the asserted federal law claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836(c), and under federal question jurisdiction pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1357 because they are part of the same case or controversy.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1391(b) and (c), because Mattson resides in this District and the Individual Defendants, all former Mattson employees, have signed a Proprietary Information and Innovations Assignment Agreement in this District and agreed for the purposes of "Dispute Resolution" that the PIIA "shall be governed by and construed according to the laws of the State of California" in recognition of the location of "principal office of [Mattson]."[1] As explained above, the Defendants also reside in this District. Additionally, the Defendants each also committed wrongful acts within this District.

---

[1] Exs. A and B, Mattson Proprietary Information and Innovations Assignment Agreement (executed by Dr. Vladimir Nagorny) § 17; Ex. E, Termination Certification Appended as Exhibit B to the Mattson Proprietary Information and Innovations Assignment Agreement (executed by Mr. Rene George); *see also* Ex. C, Mattson Confidentiality Agreement (executed by Mr. Rene George) § 13.

9.      For purposes of divisional assignment under Civil L.R. 3-2(c) and 3-5(b), this action involves intellectual property rights to be assigned on a district-wide basis pursuant to General Order No. 44.

## BACKGROUND

10.      Mattson designs, manufactures, markets, and supports the global semiconductor equipment industry critical to the fabrication of integrated circuits. Founded in 1988 in Fremont, California, Mattson is recognized as a technology leader, as well as a commercial leader in the development and sale of plasma dry strip tools for plasma processing of semiconductor wafers. These plasma dry strip tools are also commonly referred to within the industry as plasma ashing tools and these terms may be used interchangeably herein. Plasma dry strip tools may be used for the removal of materials such as masking layers from a semiconductor wafer during a semiconductor fabrication process.

11.      Different plasma sources have been used for the purpose of plasma ashing in wafer fabrication. One example of plasma dry strip processing tool is where a plasma is generated in a remote plasma chamber. The remote plasma chamber includes a tube with an induction coil about the tube. A plasma is induced in the plasma chamber by energizing the induction coil with radiofrequency energy. Radicals and other species generated in the plasma may pass through a separation grid for exposure to a semiconductor wafer in a downstream processing chamber for removal of photoresist primarily, and other materials from the semiconductor wafer.

12.      Mattson's plasma source technology is also the foundation for products beyond the plasma dry strip applications. The related technology knowhow and trade secrets are highly critical in Mattson's product lines. These additional product lines also include, for example, high-selective etch, surface treatment, and interface/surface modification.

13.      Mattson contends for sales of its plasma processing equipment in a highly competitive and specialized market that is comprised of only Mattson, Applied, and a handful of others. Mattson understands and welcomes open competition and the innovation that can result. However, that competition cannot be built unfairly through trade secret theft.

**A.      Mattson's Plasma Processing Equipment Business**

14.      Mattson is a leader in the global plasma processing equipment market used in the fabrication of semiconductors. Mattson's plasma processing equipment includes the SUPREMA® product family, and selective materials removal and surface treatment products under the NOVYKA® product family. Mattson's surface treatment and selective materials removal processing equipment are sold in interstate and international commerce.

15.      Mattson's plasma processing equipment incorporates and is designed using Mattson's innovative trade secret and proprietary technology. As an example, Mattson's NOVYKA® I plasma tool incorporates Mattson's trade secret technology to implement plasma based isotropic materials removal processes. The proprietary surface cleaning, surface treatment and surface modification characteristics achieved by Mattson's NOVYKA® I plasma processing equipment address significant challenges in scaling of devices in various markets, including automotive, power, memory, and logic. Among these manufacturing challenges is selective removal of certain layers without damaging or removing other layers and without affecting other features. These requirements can be met by the plasma processing equipment because conventional wet chemistry processes are inadequate to meet the requirements of cleaning the very bottom of the high-aspect ratio features while maintaining device structure integrity.

16.      Mattson's remote plasma tools, including the plasma processing tools incorporating or designed using the pertinent trade secrets, are sold the world over. The sales of these plasma processing tool systems to each of Mattson's customers, including sales of NOVYKA® I remote plasma surface treatment and materials removal tools, are made pursuant to confidentiality and/or non-disclosure agreements including related to the trade secret aspects of the designs and configurations of the remote plasma materials removal tools.

17.      One example of pertinent trade secrets used in conjunction with Mattson's plasma processing tools were developed as a result of an effort internally referred to as "Project Traveler." "Project Traveler" was directed to the development of a remote plasma processing equipment suitable for processing 450 mm wafers. Initial work involving the research and development of the "Project Traveler" source began in late 2011 and the experimental and

testing work continued through 2012. Under the direction of Mr. Rene George, the Director of the Plasma Etch and Strip Division at Mattson at the time, Dr. Vladimir Nagorny explored various technological designs to develop this equipment. Dr. Vladimir Nagorny also conducted numerous tests and experiments in support of "Project Traveler." These designs, tests, and experiments led to the further development of several proprietary approaches to functional remote plasma processing equipment. One of the proprietary approaches under "Project Traveler" was known as the "Green Path" design and another proprietary approach under the same project was known as the "Grey Path" design. The information and concepts related to both the "Green Path" and the "Grey Path" were, and are still, considered by Mattson as important and sensitive trade secret information within the company.

18.     Under the "Green Path" approach, Dr. Vladimir Nagorny, in conjunction with others, developed confidential, proprietary, and trade secret information by designing and subsequently testing and validating the use of magnetic field concentrators in conjunction with a remote plasma source. Among other advancements, the "Green Path" work involved the testing of the use of induction coils at various heights around a remote plasma source. As part of the experiments, magnetic field concentrators were used in conjunction with the induction coils. The positions of the inductive coils were varied about the height of the tube to determine effectiveness on radial uniformity at the semiconductor wafer. For example, in some experiments, the position of the inductive coil was at the bottom 1/3 height of the source.  As another example, in some experiments the position of the inductive coil was at the bottom 1/4 height of the source. As a result of these experiments, Dr. Vladimir Nagorny and Mr. Rene George, among others, developed, learned, and had access to information indicating that the use of magnetic field concentrators increases efficiency of plasma generation at the bottom of the source and significantly increases the radial control near the substrate. This information is important to the design of remote plasma sources to achieve better uniformity of wafer processing. This information was not readily ascertainable and was maintained confidential and secret by Mattson.

19.     Under the "Grey Path" approach, Dr. Vladimir Nagorny, in conjunction with

others, developed confidential, proprietary, and trade secret information by designing and subsequently testing and validating the use of a gas injection insert in conjunction with a remote plasma source. The gas injection insert was developed and patented by Mattson as part of High Efficiency Plasma Source (HES) technology. However, during the development of the "Grey Path" technology, Dr. Vladimir Nagorny and Mr. Rene George, developed, learned, and had access to information regarding the design of remote plasma sources using a gas injection insert that was not disclosed to the public and was maintained as a trade secret by Mattson. For instance, Dr. Vladimir Nagorny ran numerous experiments that adjusted the position of the gas injection insert relative to the induction coil in the plasma source. As a result of these experiments, Dr. Vladimir Nagorny and Mr. Rene George, among others, developed, learned, and had access to information pertaining to the "Grey Path" trade secrets. For example, in some experiments, control of the alignment of the coil with a surface edge of the gas injection insert was done as a way to provide control of the source efficiency for a plasma process. This information is important to the design of remote plasma sources to achieve better source efficiency. This information was not readily ascertainable and was maintained confidential and secret by Mattson.

**B.      Mattson Diligently Protects Its Trade Secret Plasma Processing Equipment Designs**

20.     Because of the highly valuable nature of Mattson's trade secrets related its plasma processing tools, the knowledge and information resulting from the "Green Path" and "Grey Path" approaches under "Project Traveler" was never shared publicly. This information was maintained as confidential by Mattson and is of business importance to Mattson due to the competitive advantage achieved as a product differentiator within Mattson's offerings of plasma processing equipment.

21.      Mattson takes a multitude of steps tailored to the circumstances to, as is most reasonably possible, ensure the protection of its trade secret information.

22.     Among other things, Mattson restricts access to trade secret information on a need-to-know basis. For those necessary Mattson employees who are involved with or may be

involved with the design and development of Mattson trade secrets, or may be required to learn of Mattson's trade secrets, such employees are required to sign confidentiality agreements in the form of a Proprietary Information and Innovations Assignment Agreement ("PIIA") that reiterates the employee's duties to maintain and preserve as confidential any trade secret information of Mattson, including following an employee's departure from Mattson.

23.     For example, the PIIA signed by those employees in a trusted position requires that, "at all times, both during the term of my employment with [Mattson] and after my separation from [Mattson] for any reason, I shall hold in strictest confidence and trust and shall not, directly or indirectly, use or disclose without the prior written authorization of [Mattson], except as may be necessary in the ordinary course of performing my employment duties as an employee of [Mattson], any Mattson Proprietary Information that I may have or acquire during the period of my employment with [Mattson]."

24.     The PIIA goes on to explicitly reiterate that "misappropriation of [Mattson's] trade secrets may result in civil liability under the Uniform Trade Secrets Act, as adopted in California Civil Code Section 3426, or similar laws in other locations, and, if willful, may result in an award for triple the amount of [Mattson's] damages and attorneys' fees."

25.     Similarly, certain other Mattson employees that may be involved in the development of or have access to Mattson trade secrets were required to sign a Confidentiality Agreement. Among other things, the Confidentiality Agreement signed by these Mattson employees requires that, "at any time during or following the term of Employee's employment by [Mattson], directly or indirectly, disclose, divulge, reveal, report, publish, transfer or use, for any purpose whatsoever, any of such information" including "confidential information of a special and unique nature and value relating to such matters and [Mattson's] trade secrets."

26.     In managing the transition of employees leaving Mattson, as part of the offboarding process departing employees are required to review again the PIIA and acknowledge their continuing obligations under the provisions of the PIIA on an exit checklist. Further, during the exit process, departing employees are required to sign a Termination Certification incorporated with the PIIA as Exhibit B thereto. The Termination Certification signed by

1    departing Mattson employees restates those employee's duty to "preserve as confidential all

2    trade secrets, confidential knowledge, data or other proprietary information relating to products,

3    processes, knowhow, designs, formulas, developmental or experimental work, computer

4    programs, data bases, other original works of authorship, customer lists, business plans, financial

5    information or other subject matter pertaining to any business of Mattson."

6         27.     Furthermore, Mattson employs the use of passwords and encryption to protect

7    data on its computers, servers, and repositories that may contain trade secret information.

8    Mattson uses training and regularly promulgates policies emphasizing employees' duties to

9    maintain the secrecy of Mattson's confidential and trade secret information, including post-

10   separation from Mattson. Mattson additionally uses confidentiality agreements and non-

11   disclosure agreements to require vendors, customers, partners, contractors, and other third parties

12   to maintain the secrecy of Mattson's confidential information if the circumstances require such

13   third parties to have access to Mattson's trade secret information. Mattson also uses physical

14   restrictions on access to spaces where trade secret designs are developed, tested, and kept, such

15   as clean rooms where physical prototypes based on Mattson's trade secret designs are built and

16   tested.

17                 **C.**     **Dr. Vladimir Nagorny**

18        28.     Dr. Vladimir Nagorny first became an employee of Mattson around August 2006.

19   Dr. Vladimir Nagorny was hired as a Research Scientist in the Plasma Technology Group and

20   was eventually promoted to "Fellow" at Mattson. As part of Dr. Vladimir Nagorny's

21   employment, he was tasked with research and development of plasma processing equipment for

22   use in Mattson's commercial tools.

23        29.     Dr. Vladimir Nagorny worked at Mattson for nearly eleven years, where he was

24   significantly involved in the development of technology for Mattson's plasma processing tools.

25   Example projects he worked on involved the "Green Path" approach and the "Grey Path"

26   approach developed under "Project Traveler." Dr. Vladimir Nagorny was also integrally

27   involved with the development of the HES plasma source.

28        30.     Because of the technical design function of his employment function while at

Mattson, Dr. Vladimir Nagorny was required to and did sign a Proprietary Information and Innovations Assignment Agreement ("PIIA") where Dr. Vladimir Nagorny agreed to "at all times, both during the term of my employment with [Mattson] and after my separation from [Mattson] for any reason, I shall hold in strictest confidence and trust and shall not, directly or indirectly, use or disclose without the prior written authorization of [Mattson], except as may be necessary in the ordinary course of performing my employment duties as an employee of [Mattson], any Mattson Proprietary Information that I may have or acquire during the period of my employment with [Mattson]." Exs. A and B, Mattson Proprietary Information and Innovations Assignment Agreement (executed by Dr. Vladimir Nagorny) § 17.

31.     Dr. Vladimir Nagorny left Mattson on June 16, 2017. Upon leaving, Dr. Vladimir Nagorny reviewed and reacknowledged his continuing obligations to preserve as confidential all trade secrets under the PIIA as indicated by the executed Termination Certification and signed Exit Checklist. Ex. D, Termination Certification (executed by Dr. Vladimir Nagorny); Ex. F, Exit Checklist (signed by Dr. Vladimir Nagorny).

### D.     Rene George

32.      Rene George became an employee of Mattson around January 1996. Rene George was eventually promoted to the position of Vice President at Mattson and was the General Manager of the Plasma Etch and Strip Division. Due to his leadership position within the Plasma Etch and Strip Division at Mattson, Rene George oversaw the research and development of technology pertaining to plasma processing equipment, including research and development as part of "Project Traveler" performed by Dr. Vladimir Nagorny.

33.     Mr. Rene George worked at Mattson for over nineteen years, where he was significantly involved and oversaw the development of technology for Mattson's plasma processing tools, including the "Green Path" approach and the "Grey Path" approach developed under "Project Traveler" and the development of Mattson's HES plasma source.

34.     Because of his role as General Manager overseeing many of Mattson's most critical developments, Mr. Rene George was required to and did sign a Confidentiality Agreement in which he agreed not to, "at any time during or following the term of Employee's

1  employment by Employer, directly or indirectly, disclose, divulge, reveal, report, publish,

2  transfer or use, for any purpose whatsoever, any of such information" including "confidential

3  information of a special and unique nature and value relating to such matters and Employer's

4  trade secrets." Ex. C, Confidentiality Agreement (executed by Mr. Rene George).

5       35.    Additionally, in the course of Mr. Rene George's exit process from Mattson, he

6  further signed the Termination Certification portion of the Proprietary Information and

7  Innovations Assignment Agreement ("PIIA"). In so doing, Mr. Rene George agreed, among

8  other obligations, to "preserve as confidential all trade secrets, confidential knowledge, data or

9  other proprietary information relating to products, processes, knowhow, designs, formulas,

10  developmental or experimental work, computer programs, data bases, other original works of

11  authorship, customer lists, business plans, financial information or other subject matter

12  pertaining to any business of Mattson." Mr. George left Mattson on January 9, 2015. Upon

13  leaving Mr. George reviewed the PIIA and signed the Termination Certification. Ex. E,

14  Termination Certification (signed by Mr. Rene George).

15            **E.    Defendants Used and Publicly Disclosed Mattson's Trade Secrets**

16       36.    Upon his departure from Mattson, Mr. Rene George joined Applied in January

17  2015, also as a General Manager. Subsequently, around July 2017, Dr. Vladimir Nagorny

18  followed Mr. Rene George to Applied where he was assigned a similar role of Physicist/Scientist

19  Dir DMTS working to develop technologies and products to support Applied's business under

20  the supervision of Mr. Rene George.

21       37.    Dr. Vladimir Nagorny and Mr. Rene George are not alone as former employees

22  who were directly recruited to Applied. Upon information and belief, Applied has launched a

23  campaign to hire away employees of Mattson. Since Mr. Rene George was poached from

24  Mattson by Applied in 2015, at least a dozen other former Mattson employees, including Dr.

25  Vladimir Nagorny, have been hired by Applied. Upon information and belief, although these

26  additional employees are not named as inventors on the patent applications filed by Applied that

27  disclose Mattson's trade secrets, because of the pattern of misappropriation demonstrated by the

28  Defendants, they have also been recruited in the misappropriation of Mattson's trade secrets for

the potential development of a competing product rooted in Mattson's trade secret information.

38.     During their employment with Applied, Dr. Vladimir Nagorny and Mr. Rene George have improperly used and misappropriated confidential and trade secret information developed at Mattson for the benefit of and in the furtherance of activity for Applied. Upon information and belief, Dr. Vladimir Nagorny and Mr. Rene George, while working at Applied, have improperly used this information to Applied's advantage, unfairly prejudicing Mattson.

39.     As examples evidencing this improper use and disclosure, on January 14, 2021, Applied Materials filed at least two patent applications naming Dr. Vladimir Nagorny and Mr. Rene George as inventors. The two patent applications use and disclose Mattson's trade secrets that they had developed and had access to while previously employed by Mattson. These patent applications, each filed under Applied Materials, Inc. as the Applicant, include U.S. Pat. App. Serial Nos. 17/149,254 (the "'254 Application") and 17/149,232 (the "'232 Application") (collectively, the "Disclosing Patent Applications"). The '254 Application was subsequently published to the general public as U.S. Pat. Pub. No. 2022/0223374 on July 14, 2022 and issued as U.S. Pat. No. 11,658,006 (the "'006 Patent") on May 23, 2023. The '232 Application was published as U.S. Pat. Pub. No. 2022/0223381 (the '381 Publication"), also on July 14, 2022. The publication of the Disclosing Patent Applications to the public at large forever and irreversibly disclosed Mattson's valuable trade secret information without the consent of Mattson.

40.     More particularly, Dr. Vladimir Nagorny and Mr. Rene George worked on Project Traveler. As described above, Project Traveler was directed to the development of a remote plasma processing equipment suitable for processing 450 mm wafers.

41.     Dr. Vladimir Nagorny and Mr. Rene George explored multiple different types of sources, including a "Grey Path" Source and a "Green Path" Source. Details learned and developed during the research of these sources at Mattson were improperly used and disclosed by Applied in the patent applications.

42.     The Disclosing Patent Applications include written descriptions of Mattson's trade secrets.

43.    As one example, the patent applications disclose the use of a magnetic field concentrator, related to Mattson's "Green Path" source trade secrets. These trade secrets were researched and developed by Dr. Vladimir Nagorny and Mr. Rene George while at Mattson.

44.    For example, the Disclosing Patent Applications improperly and forever disclose aspects of Mattson's "Green Path" trade secrets in discussing the drawings, including Figure 2:



FIG. 2

'006 Patent, Fig. 2 (Ex. G); '381 Publication, Fig. 2 (Ex. H).

45.    The Disclosing Patent Applications included, in relevant part, the following written descriptions of Mattson's "Green Path" trade secrets:

> "The second induction coil includes magnetic field concentrator(s) 280, allowing a placement of the coil in the bottom of the plasma source, as shown in FIG. 2 . The use of magnetic field concentrators 280 increases efficiency of the plasma generation at the bottom of the source and significantly increases the radial control near the substrate (as compared to the absence of magnetic field concentrators). In some embodiments, induction coil 254 is disposed at a bottom ⅓ height, such as a bottom ¼ height, of plasma source 222.

'006 Patent, 6:46-55 (Ex. G); '381 Publication, [0041] (Ex. H).

46.    Both Dr. Vladimir Nagorny and Mr. Rene George had access to these "Green Path" trade secrets during their time at Mattson. For example, Dr. Vladimir Nagorny tested using

a magnetic field concentrator at this precise location of a plasma source in a remote plasma

context in the "Green Path" source. As another example, Mr. Rene George served as the Director

of the Plasma Etch and Strip Division. As such, Mr. Rene George received regular updates on

the development of the "Green Path" trade secrets while at Mattson.

47.     As another example, the Disclosing Patent Applications describe details related to

the positioning of inductive coil relative to the gas injection insert associated with aspects of

Mattson's "Grey Path" trade secrets. As with the "Green Path" trade secrets, Mattson's "Grey

Path" trade secrets were researched and developed by Dr. Vladimir Nagorny and Mr. Rene

George at Mattson Technology during development of the "Grey Path" source, the HES source,

and other technologies.

48.     For example, the Disclosing Patent Applications improperly and forever disclose

aspects of Mattson's "Grey Path" trade secret designs in discussing the drawings, including

Figure 1:



FIG. 1

'006 Patent, Fig. 1 (Ex. G); '381 Publication, Fig. 1 (Ex. H).

49.     The Disclosing Patent Applications also included, in relevant part, the following written descriptions of Mattson's "Grey Path" trade secrets:

> The coil 130 is aligned with the active region in such a way that the top turn of the coil is above the bottom edge 180 of the insert 140 and operates substantially in the active region of the inner volume, while the bottom turn of the coil is below edge 180 and operates substantially outside the active region. The center of the coil is substantially aligned with the edge 180. Within these boundaries one can adjust the coil position for a desired performance. Alignment of the coil with surface edge 180 provides improved source efficiency, namely controlled generation of desired chemical species for plasma processes and delivering them to the wafer with reduced or eliminated losses. For example, plasma sustaining conditions (balance between local generation and loss of ions) might not be the best for generating species for a plasma process. Regarding delivery of the species to the substrate, efficiency can depend on the volume and wall recombination of these particular species. Hence, control of the alignment of the coil with surface edge 180 provides control of the source efficiency for a plasma process.
> . . .
> In some embodiments, surface 180 is aligned with a portion of induction coil 130 (e.g., coil loop 182) along axis 184 by utilizing a suitably sized insert 140 (and top plate 124, which may be a preformed part of the insert 140) to form plasma source 120. Alternatively, surface 180 can be movable along a vertical direction Vi relative to plasma source 120 while a remainder portion of insert 140 is static (e.g., fixed) as part of plasma source 120, in order to provide alignment of surface 180 with a portion of coil 130. For example, an actuator 170 is coupled to insert 140 to adjust a position of surface 180 such that a portion of insert 140 having a first length (L1) is adjusted to a second length (L2). Actuator 170 can be any suitable actuator, for example a motor, electric motor, stepper motor, or pneumatic actuator. In some embodiments, a difference (Δ) in length from L1 to L2 is about 0.1 cm to about 4 cm, such as about 1 cm to about 2 cm. Additionally or alternatively, the insert 140 can be coupled to an actuator (such as actuator 170), and actuator 170 is configured to move the entirety of insert 140 vertically (e.g., along a vertical direction Vi relative to plasma source 120), in order to align surface 180 with a portion of coil 130. Spacers (not shown) can be used to fill gap(s) between insert 140 and another portion of plasma source 120 (such as between top plate 124 and dielectric sidewall 122) that were formed by moving the insert vertically. The spacers may be formed from, for example, a ceramic material, such as a quartz.
> In general, positioning coil 130 center above surface 180 will increase the efficiency of ionization and dissociation, but reduces the transport efficiency of these species to the substrate, as many of the species may recombine on the walls of the narrow active region. Positioning the coil 130 below surface 180 can improve plasma delivery efficiency, but may decrease plasma generation efficiency.

'006 Patent, 4:43-5:35 (Ex. G); '381 Publication, [0032, 0034-36] (Ex. H).

50.     Both Dr. Vladimir Nagorny and Mr. Rene George had access to these "Grey

1   Path" trade secrets during their time at Mattson. For example, Dr. Vladimir Nagorny tested and
2   optimized the positioning of the induction coil relative to the bottom plane of the insert in the
3   "Grey Path" source. As another example, Mr. Rene George served as the Director of the Plasma
4   Etch and Strip Division. As such, Mr. Rene George received regular updates on the development
5   of the "Grey Path" trade secrets while at Mattson.

6        51.    Upon information and belief, these trade secrets are non-exclusive examples of
7   confidential technology misappropriated by the Defendants. This pattern of improper disclosure
8   evidences that Applied is having Dr. Vladimir Nagorny and Rene George improperly use and
9   disclose confidential trade secret information of Mattson during the scope of employment in the
10  furtherance of Applied business. Upon information and belief, Applied is commercializing
11  plasma processing equipment and seeking improper intellectual property rights based on this
12  information, further improperly using and disclosing confidential trade secret information of
13  Mattson.

14       52.    Upon information and belief, Applied is incorporating Mattson's misappropriated
15  trade secrets into the designs and developments of its own commercial products.

16                          **FIRST CAUSE OF ACTION**
                    Misappropriation of Trade Secrets Under 18 U.S.C. § 1836, et seq.
17                                 (Against All Defendants)

18       53.    Mattson realleges and restates all prior paragraphs as if fully restated herein.

19       54.    Mattson is the owner of certain trade secret and confidential information, as set
20  forth herein including at least in paragraphs 14-18 above.

21       55.    As set forth above, while at Mattson, the Individual Defendants possessed
22  information, including but not limited to financial, business, scientific, technical, economic, or
23  engineering information, including patterns, plans, compilations, program devices, formulas,
24  designs, prototypes, methods, techniques, processes, procedures, programs, or codes constituting
25  "trade secrets" as defined by 18 U.S.C. § 1839(3). These trade secrets pertain to Mattson's
26  plasma processing equipment, including the design, arrangement, characteristics, and
27  configuration of Mattson's plasma processing equipment and other Mattson-developed know
28  how gained from years of developing innovative plasma processing equipment. These trade

secrets are related to a product and/or service used in and/or intended for use in interstate and/or foreign commerce.

56.     Mattson's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, another person who can obtain economic value from their disclosure or use of the information. These trade secrets are also the product of years of research and development at substantial cost to Mattson. These trade secrets form the foundation of Mattson's competitive advantages in the plasma processing equipment market.

57.     Mattson has undertaken efforts that are reasonable under the circumstances to maintain the secrecy of the trade secrets at issue. These efforts include, but are not limited to: the use of passwords and encryption to protect data on its computers, servers, and repositories; the limited distribution of confidential information only to key Mattson employees and executives and on a need-to-know basis; the maintenance of written policies and procedures that emphasize employees' duties to maintain the secrecy of Mattson's confidential information; the use of confidentiality agreements and non-disclosure agreements to require vendors, customers, partners, contractors, and employees to maintain the secrecy of Mattson's confidential information; and physical restrictions on access to spaces where trade secret designs are developed, tested, and kept.

58.     Defendants misappropriated these trade secrets by using and publicly disclosing them despite knowing at the time they were used and disclosed that the Individual Defendants were under a duty to maintain them as secret as the confidential trade secret information of Mattson. At least by virtue of the PIIAs, termination certifications, and exit checklists they signed, the Individual Defendants were well aware that the Mattson trade secrets that were misappropriated are confidential and trade secret, and could not properly be retained, disclosed, or used by them. Nevertheless, each Individual Defendant executed a termination certification and exit checklist for departing employees in which they confirmed and acknowledged that they had returned all Mattson proprietary and trade secret information and further agreed to continue to preserve as confidential all Mattson trade secrets.

59.     As further set forth above, the Defendants disclosed and/or used Mattson's trade secret information, without the consent of Mattson, at least by including it as part of the disclosures in patent application filings with the United States Patent and Trademark Office that were made public in due course. At least the Individual Defendants had knowledge that each was under a continuing duty to maintain the secrecy of the Mattson trade secret information when they submitted it in the patent filings, and they breached that duty. Likewise, Applied actually knew or had reason to know that because of the Individual Defendants' former employment at a competitor, Mattson, they owed a duty to maintain the secrecy due to the sensitive nature of the Mattson trade secrets, and Applied induced breach of such duty.

60.     Further information regarding the use and disclosure of Mattson's trade secrets at Applied is uniquely within the possession of the Individual Defendants and Applied. However, based at least on the number of former Mattson employees at Applied who perform the same type of work they were performing at Mattson and the nature of the information taken, on information and belief, Applied knew, or at a minimum should have known, that these employees improperly retained and used Mattson confidential and trade secret information and were likely to and did make use of it in the course of their employment at Applied.

61.     Defendants' improper acquisition and/or unauthorized use or disclosure, actual or threatened, violates the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq.

62.     As a direct and proximate result of Defendants' conduct, Mattson has been injured, and is threatened with further injury, in an amount that will be proven at trial. Mattson has also incurred, and will continue to incur, additional damages, costs, and expenses, including attorneys' fees, as a result of Defendants' misappropriation. As a further proximate result of the misappropriation and use of Mattson's trade secrets, Defendants have been unjustly enriched, including obtaining a grant of a U.S. Patent and the filing of pending patent applications improperly using Mattson's trade secrets.

63.     Defendants' conduct has been willful and malicious, justifying an award of exemplary damages. The disclosure of Mattson's trade secret information in patent applications filed by the Defendants includes some of the most competitively sensitive and confidential

information that Mattson possesses about its plasma processing equipment designs. The Individual Defendants and other former Mattson employees now at Applied falsely represented to Mattson that would continue to preserve as confidential all Mattson trade secrets, confidential knowledge, data, or other proprietary information.

64.     Defendants' conduct constitutes transgressions of a continuing nature for which Mattson has no adequate remedy at law. Unless and until enjoined and restrained by order of this Court, Defendants may continue to misappropriate Mattson's trade secret information to enrich themselves and divert business from Mattson to Applied. Mattson is entitled to a preliminary and permanent injunction against Defendants' actual and threatened potential violation of the DTSA.

### SECOND CAUSE OF ACTION
Breach of Contract
(Against Individual Defendants)

65.     Mattson realleges and restates all prior paragraphs as if fully restated herein.

66.     The PIIAs and Confidentiality Agreement signed by the Individual Defendants are valid and enforceable contracts. The confidentiality covenants and other provisions contained in these agreements are reasonably necessary to protect legitimate protectable interests in Mattson's confidential, proprietary, and trade secret information.

67.     Mattson has fully performed all of its obligations under these agreements.

68.     The Individual Defendants violated the provisions of the PIIAs and/or Confidentiality Agreement, which required them to, "at all times, both during the term of my employment with [Mattson] and after my separation from [Mattson] for any reason, I shall hold in strictest confidence and trust and shall not, directly or indirectly, use or disclose without the prior written authorization of [Mattson], except as may be necessary in the ordinary course of performing my employment duties as an employee of [Mattson], any Mattson Proprietary Information that I may have or acquire during the period of my employment with [Mattson]." Moreover, the Individual Defendants recognized the significance of their obligations under the provisions of the PIIAs that explicitly required, by signing the PIAA, that the Individual Defendants "understand and acknowledge that misappropriation of [Mattson's] trade secrets may result in civil liability under the Uniform Trade Secrets Act, as adopted in California Civil Code

Section 3426, or similar laws in other locations, and, if willful, may result in an award for triple the amount of [Mattson's] damages and attorneys' fees." The Individual Defendants also reaffirmed and certified in their Termination Certification signed by each of the Individual Defendants upon their departure from Mattson that they would "preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, knowhow, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of Mattson." Despite indicating adherence to all contractually-obligated termination protocols, the Individual Defendants breached these agreements by, at a minimum, using and publicly disclosing Mattson's trade secrets and designs in patent application filings in contravention of their duties to Mattson.

69.     As a result of the Individual Defendants' breaches, Mattson has suffered and continues to suffer monetary and non-monetary injury, harm, and other damages in an amount to be proven at trial. Mattson has also incurred, and will continue to incur, additional damages, costs, and expenses, including attorneys' fees, as a result of the Individual Defendants' breaches.

70.     Moreover, as a result of the Individual Defendants' breaches, Mattson has been injured and faces irreparable injury. Mattson is threatened with losing its competitive advantage, trade secrets, customers, and technology goodwill in amounts that would be impossible to fully compensate Mattson unless the Individual Defendants are enjoined and restrained by order of this Court.

**THIRD CAUSE OF ACTION**
Inducing Breach of Written Contracts
(Against Defendant Applied Materials, Inc.)

71.     Mattson realleges and restates all prior paragraphs as if fully restated herein.

72.     As set forth above, the PIIAs and Confidentiality Agreement are valid and enforceable contracts between Mattson and the Individual Defendants.

73.     On information and belief, Applied knew that each of the Individual Defendants were subject to valid written confidentiality contracts pertaining to trade secrets of Mattson and Applied intended for the Individual Defendants to breach their confidentiality obligations so that

1    it could capitalize on the designs and institutional knowledge developed at Mattson.

2    74.   On information and belief, Applied's interests in obtaining a competitive

3    advantage, such as in implementing a patent incentive program for filing the Disclosing Patent

4    Applications, caused the Individual Defendants to breach their agreements with Mattson.

5    75.   Mattson was harmed by Applied's conduct, for example, in the form of inclusion

6    of Mattson trade secret information in the filing of a patent application and the loss of its

7    competitive advantage related to its plasma processing equipment business.

8    76.   As a result of the breaches of its Agreements, Mattson has suffered and continues

9    to suffer monetary and non-monetary injury and harm in an amount to be proven at trial.

10   77.   As a result of any one of the breaches of its agreements, Mattson has been injured

11   and faces irreparable injury. Mattson is threatened with losing investment and sales in amounts

12   which may not be possible to determine, unless Applied is enjoined and restrained by order of

13   this Court.

14   **FOURTH CAUSE OF ACTION**

     Unfair Competition Under California Business and Professions Code § 17200, et seq.
15   (Against All Defendants)

16   78.   Mattson realleges and restates all prior paragraphs as if fully restated herein.

17   79.   As set forth above, the conduct of each of the Defendants alleged herein,

18   constitutes unfair, unlawful, and/or fraudulent business acts or practices prohibited under Cal.

19   Bus. & Prof. Code § 17200. The conduct of Defendants are forbidden by various state and

20   federal laws, and is unfair to and has harmed Mattson including by depriving it of the value of its

21   innovations and trade secrets.

22   80.   At least the improper acquisition and use of information by Defendants alleged

23   herein constitutes unfair competition under California Business & Professions Code § 17200, et

24   seq.

25   81.   This includes, but is not limited to, seeking to compete with Mattson unfairly by

26   developing competing plasma processing equipment through the use of Mattson's trade secrets

27   rather than independent development. This also includes unfairly disclosing Mattson's trade

28   secret information to the public to threaten Mattson's intellectual property rights and ability to

protect them from other competitors. This also includes unfairly filing its own patent applications

disclosing Mattson's trade secret information. This also includes improperly seeking intellectual

property rights that do not belong to Defendants in order to unfairly compete with Mattson. *See,*

*e.g.*, Exhibit I (Assignment for Application for Patent).

82.     As a proximate result of Defendants' conduct, Mattson has suffered and will

continue to suffer actual damages, monetary and non-monetary injury, harm and other damages,

and each of the Defendants has been unjustly enriched by virtue of their conduct as alleged

herein and, consequently, Mattson has been and will continue to suffer severe competitive harm.

Defendants should further be compelled to restore any and all revenues, earnings, profits,

compensation, and benefits they have obtained from the unlawful and unfair conduct. Mattson

has suffered and will continue to suffer immediate and irreparable harm, and is entitled to

preliminary and permanent injunctive relief restraining and enjoining Defendants from engaging

in the unfair competition alleged herein.

### FIFTH CAUSE OF ACTION

Trade Secret Misappropriation Under the California Uniform Trade Secrets Act (CUTSA),
Cal. Civ. Code § 3426, et seq.
(All Defendants)

83.     Mattson realleges and restates all prior paragraphs as if fully restated herein.

84.     Mattson owns and possesses certain trade secret, confidential, and proprietary

information that is protected by the CUTSA, as alleged above. Such information includes, for

example, formulas, patterns, compilations, programs, devices, methods, techniques, and/or

processes pertaining to Mattson's plasma processing equipment. These trade secrets pertain to

Mattson's plasma processing equipment, including the design, arrangement, characteristics, and

configuration of Mattson's plasma processing equipment and other Mattson-developed know

how gained from years of developing innovative plasma processing equipment. Mattson's trade

secrets are the subject of efforts that are reasonable under the circumstances to maintain the

secrecy, including requiring its employees to agree to keep such information confidential in

Employment Agreements and/or PIIA Agreements.

85.     Mattson's trade secrets derive independent economic value from not being

generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

86.    In violation of Mattson's rights, Defendants misappropriated Mattson's trade secrets, confidential, and proprietary information at least by using and disclosing Mattson's trade secret information in published patent applications. Defendants' misappropriation of Mattson's trade secret information in the improper and unlawful manner alleged herein was intentional, knowing, willful, malicious, fraudulent, and oppressive.

87.    As the direct and proximate result of Defendants' conduct, Mattson has suffered and, if Defendants' conduct is not stopped, will continue to suffer severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial. Because Mattson's remedy at law is inadequate, Mattson seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its trade secrets, confidential and proprietary information and to protect other legitimate business interests. Mattson's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

88.    Mattson is entitled to an injunction against the misappropriation and continued threatened misappropriation of trade secrets as alleged herein and further asks the Court to restrain Defendants from using all trade secret information misappropriated from Mattson and to return all trade secret information to Mattson.

89.    Defendants' conduct was willful, malicious and fraudulent. Mattson is entitled to exemplary damages under the CUTSA.

90.    Pursuant to the CUTSA, Mattson is entitled to an award of attorneys' fees for Defendants' misappropriation of trade secrets.

## SIXTH CAUSE OF ACTION
Conversion
(All Defendants)

91.    Mattson realleges and restates all prior paragraphs as if fully restated herein.

92.    As set forth above, the conduct of the Defendants constitutes conversion. The conduct of each of the Defendants has harmed Mattson by depriving Mattson of the value of its investment in developing its trade secrets. Additionally, Defendants' conduct in improperly

seeking intellectual property rights that do not belong to Defendants has further harmed Mattson and deprived it of the value of its investment. *See, e.g.*, Exhibit I (Assignment for Application for Patent).

93.     Each of the Defendants has been unjustly enriched by virtue of their conduct as alleged herein and, consequently, Mattson has been and will continue to suffer severe competitive harm. Applied Materials has been issued a United States Patent and has other patent applications pending before the United States Patent and Trademark Office based at least in part on its improper conversion.

94.     As a direct and proximate result of the conduct of Defendants as alleged herein, Mattson has suffered damages to be proven at trial, together with reasonable attorney's fees and costs as provided for by law. The damages alone are insufficient to fully remedy Mattson for Defendants' conversion.  Mattson seeks an order assigning ownership of any documents, equipment, patents, and/or patent applications disclosing Mattson's trade secrets and proprietary information and related family members, including the '254 Application and'232 Application and the '006 Patent to Mattson.

95.     The alleged conduct of the Defendants in the improper taking of Mattson's trade secrets and proprietary information, and subsequent use thereof to the financial detriment to Mattson and to the financial benefit to the Defendants, constitutes an intentional act and misuse of Mattson's information, thereby entitling Mattson to exemplary damages in a sum to be determined by the court.

## PRAYER FOR RELIEF

WHEREFORE, Mattson respectfully prays for judgment and relief against Defendants as follows:

        a.  Judgment in Mattson's favor and against Defendants on all causes of action alleged herein;

        b.  Damages sufficient to compensate for the actual loss caused by Defendants' conduct as described in each of the causes of action herein;

        c.  A further award of monetary recovery for any unjust enrichment caused by

Defendants' conduct as described in each of the causes of action herein;

d. Alternatively, damages calculated as a reasonable royalty for Defendants' conduct as described in each of the causes of action herein;

e. An Order requiring Defendants to transfer legal title and possession to Mattson of the Disclosing Patent Applications and any related patent applications and any documents or equipment containing Mattson's trade secrets;

f. Exemplary damages, based on Defendants' willful and malicious appropriation of trade secrets;

g. For the entry of a Preliminary and Permanent Injunction against Defendants to prevent the actual or threatened misappropriation of Mattson's trade secrets;

h. An Order directing Defendants to return all of Mattson's property in their possession, custody, or control and cease any access to or use of Mattson's trade secrets;

i. An Order directing assignment of any patents and patent applications disclosing Mattson's trade secrets and related family members, including the '254 Application and '232 Application and the '006 Patent to Mattson.

j. Pursuant to Cal. Bus. & Prof. Code § 17200 et seq., and pursuant to the equitable powers of this Court, that Defendants be ordered to restore to Mattson all money or property acquired by means of their unlawful, unfair, and/or fraudulent conduct;

k. For prejudgment and post-judgment interest at the maximum legal rate as applicable, as an element of damages that Mattson has suffered as a result of Defendants' wrongful and unlawful acts;

l. For reasonable attorneys' fees and costs incurred as provided by statute or agreement; and

m. For such other and further relief the Court deems just and proper.

## **<u>JURY DEMAND</u>**

Mattson demands a trial by jury on all issues for which a jury may be impaneled in this matter.

1

2

3   Dated: November 22, 2023

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**DORITY & MANNING, P.A.**

 */s/ Nicole S. Cunningham*
Nicole S. Cunningham (CA 234390)
Steven A. Moore (CA 232114)
2869 Historic Decatur Road
San Diego, California 92106
Telephone: (864) 271-1592
ncunningham@dority-manning.com
smoore@dority-manning.com

Tim F. Williams (*pro hac vice pending*)
Mark H. Johnson (*pro hac vice pending*)
75 Beattie Place, Suite 1100
Greenville, South Carolina 29601
Telephone: (864) 271-1592
timw@dority-manning.com
mjohnson@dority-manning.com

*Attorneys for Plaintiff*
*Mattson Technology, Inc.*

COMPLAINT AND DEMAND FOR JURY TRIAL